# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| BANDSPEED, INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | CASE NO. 1:14-cv-436 |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| QUALCOMM INCORPORATED, | § | |
| QUALCOMM ATHEROS, INC., and | § | |
| QUALCOMM INNOVATIONS CENTER | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF BANDSPEED, INC.'S RESPONSE TO QUALCOMM DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

I.   SUMMARY OF THE RESPONSE ........................................................................1

II.  LEGAL STANDARD FOR DECIDING A RULE 12(c) MOTION .......................2

III. ARGUMENT & AUTHORITIES .........................................................................3

    A.  Qualcomm Defendants Fail to Satisfy Their Heavy Burden to Prove That the Parties to the CSR Agreement Intended to Benefit Qualcomm Defendants ................3

    B.  The Term "CSR" Does Not Include Any Qualcomm Defendant ...................................4

        1.  "CSR" Does Not Include Qualcomm Defendants Because California Law Requires the CSR Agreement to Be Interpreted According to the Parties' Intention as It Existed at the Time of Contracting ...................................................5

        2.  "CSR" Does Not Include Qualcomm Defendants Because the Parties Explicitly Mentioned Future Entities in Other Contexts But Not in the Definition of "CSR ..................................................................................................6

        3.  "CSR" Does Not Include Qualcomm Defendants Because the Same Word Used in Different Parts of a Writing Must Have the Same Meaning .....................7

    C.  The Term "CSR Licensed Products" Does Not Include Any Qualcomm Product ..........8

    D.  Bandspeed Did Not Grant a Release to the Qualcomm Defendants ...............................9

        1.  The Terms "Party" and "CSR" as Used in the Release Do Not Include Qualcomm Defendants...................................................................................................9

        2.  Qualcomm Defendants Are Not Successors of CSR .............................................10

    E.  The Accused Products Are Not Licensed ....................................................................12

        1.  The Term "CSR" as Used in the License Does Not Include Qualcomm Defendants ..............................................................................................................12

        2.  The Term "CSR Licensed Products" as Used in the License Does Not Include the Accused Products of Qualcomm Defendants.......................................14

        3.  The License Was Not Transferred or Assigned to Defendants Through a Change of Control...................................................................................................14

            a.  The License Is Expressly Non-Transferable and Cannot be Sublicensed........14

            b.  A Section 10 Change of Control Does Not Make the License Transferable or Assignable .................................................................................15

            c.  Section 3 Expressly Forbids Transfer of the Bandspeed License and the Only Language in Section 3 Related to a Change of Control Is Not Applicable Because It Applies Solely to a Bandspeed Change of Control ....................................................................................................................16

    F.  Bandspeed Did Not Covenant Not to Sue Defendants ................................................16

        1.  The Term "CSR" as Used in the Covenant Not to Sue Does Not Include Qualcomm Defendants...................................................................................................16

2.   The Term "CSR Licensed Products" as Used in the License Does Not Include the Accused Products of Qualcomm Defendants.................................18

3.   Cambridge Silicon Radio Limited's Rights Under the Covenant Were Not Transferred or Assigned to Qualcomm Defendants through a Change of Control ...........................................................................................................18

G.   Disputed Issues of Fact Regarding the CSR Agreement Require the Denial of Defendants' 12(c) Motion ...........................................................................19

# TABLE OF AUTHORITIES

## CASES

*Abreu v. Zale Corp.,*
No. 3:12-CV-2620-D, 2013 WL 1949845, at *1 (N.D. Tex. May 13, 2013) ..................... 3, 20

*Advanced Micro Devices, Inc. v. Altera Corp.,*
1996 WL 119482 (N.D. Cal. Mar. 11, 1996) .......................................................... 11

*Brinton v. Bankers Pension Services, Inc.,*
90 Cal.Rptr.2d at 474 ....................................................................................... 18

*Doe v. Myspace, Inc.,*
528 F.3d 413 (5th Cir. 2008) ............................................................................. 2

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.,*
32 Cal. 4th 465, 84 P.3d 385 (2004) .................................................................... 7

*Gentilello v. Rege,*
627 F.3d 540 (5th Cir. 2010) ............................................................................. 3

*Geske v. Wells Fargo Bank, Nat. Ass'n,*
No. 3:11-CV-3337-L, 2012 WL 1231835, at *3 (N.D. Tex. Apr. 12, 2012) ..................... 3

*Greenberg v. General Mills Fun Group, Inc.,*
478 F.2d 254 (5th Cir. 1973) ............................................................................. 3

*GTE Wireless, Inc. v. Cellexis International, Inc.,*
341 F.3d 1 (1st Cir. 2003) ................................................................................. 17

*Guidry v. Am. Public Life Ins. Co.,*
512 F.3d 177 (5th Cir. 2007) ........................................................................... 3, 20

*Hess v. Ford Motor Co.,*
41 P.3d 46 (Cal. 2002) ...................................................................................... 4

*Johnson v. Johnson,*
385 F.3d 503 (5th Cir. 2004) ............................................................................. 2

*Murphy v. DirecTV, Inc.,*
724 F.3d 1218 (9th Cir. 2013) ........................................................................... 6

*Neverkovec v. Fredericks,*
87 Cal. Rptr. 2d 856 (Ct. App. 1999) ................................................................. 4, 6

*Shaunfield v. Experian Info. Solutions, Inc.*,
  991 F.Supp.2d 786 (N.D. Tex. 2014) ....................................... 2

*Stanton v. Larsh*,
  239 F.2d 104, 106 (5th Cir. 1956) ......................................... 3,20

*Unova, Inc. v. Acer Inc.*,
  363 F.3d 1278 (2004) ...................................................... 6, 13

*Vahle v. Barwick*,
  113 Cal. Rptr. 2d 793 (Ct. App. 2001) .................................... 3, 4

*Whitehurst v. Liquid Environmental Solutions, Inc.*,
  45 F. Supp.3d 1328 (M.D. Fla. 2014) ...................................... 3, 20

*Whiteside v. Tenet Healthcare Corp.*,
  124 Cal. Rptr. 2d 580 (Ct. App. 2002) .................................... 3

## STATUTES

Cal. Civ. Code § 1636 ........................................................ 5, 18

Cal. Civ. Code § 1639 ........................................................ 18

Cal. Civ. Proc. Code § 1856 .................................................. 18

## OTHER AUTHORITIES

Blacks Law Dictionary, 6th Ed., at 1431 ................................... 10

# I.     SUMMARY OF THE RESPONSE

On October 18, 2012, Bandspeed and CSR entered the subject "CSR Agreement. "[1]  On August 13, 2015, an affiliate of Qualcomm Defendants allegedly acquired, to some unknown extent, an affiliate of Cambridge Silicon Radio Limited.  Qualcomm Defendants now ask this Court to enforce the CSR Agreement, to which they are not a party, arguing that Qualcomm Defendants—as parents, successors and/or affiliates of a party to the CSR Agreement—are protected by the release, license, and covenant not to sue granted by Bandspeed to CSR. This argument, however, invites this Court to disregard fundamental canons of contract interpretation enshrined in controlling statutes under California law. Specifically, Defendants' argument requires the CSR Agreement to be construed temporally as a dynamic, ever-changing document rather than as of its Effective Date and facially disregards language carefully chosen by the parties to the CSR Agreement.  Simply put, Bandspeed did not release, license, or covenant not to sue the Qualcomm Defendants–unidentified and unanticipated third parties.

Qualcomm Defendants fail to satisfy their heavy burden to prove that Bandspeed and CSR intended the CSR Agreement to benefit them.  Qualcomm Defendants are not entitled to the benefit of the CSR Agreement's release, license, or covenant not to sue because the term "CSR," as used in those provisions, does not include CSR's *future* parents, subsidiaries, or affiliates. Further, the terms "CSR Licensed Products," as used in the license and covenant not to sue, and "products sold by or for [CSR]," as used in release, do not include Qualcomm Defendants' products.

---

[1] (Docs. 93-95, Exs. A ("CSR Agmt.").)  "'CSR' means, collectively, Cambridge Silicon Radio Limited, CSR Technology Inc., and each of their respective parents, subsidiaries, and affiliates."  (CSR Agmt. at § 1.)

[2] *See also Whitehurst v. Liquid Environmental Solutions, Inc.*, 45 F. Supp.3d 1328, 1339 (M.D. Fla. 2014) ("For purposes of a motion for judgment on the pleadings, all the non-moving party's pleadings are taken as true, ***and if denied, the moving party's allegations are taken as false***." (emphasis added)).  Additionally, the Court must not consider attachments to a defendant's pleading unless they are "referred to in the Complaint and are central to

In addition, the CSR Agreement prohibits transfer or assignment of the release, license, and covenant not to sue to the Qualcomm Defendants, despite any "change of control" of CSR. Further, Qualcomm Defendants fail to show that they are released as "successors" or "assigns" of CSR or that they are entitled to enforce the covenant not to sue as an "acquiring or surviving party" under the CSR Agreement.

Finally, Qualcomm Defendants' arguments rely on disputed factual allegations regarding the existence, nature, and effect of the CSR plc acquisition by an alleged Qualcomm affiliate that may not form the basis of a Rule 12(c) motion.

## II.   LEGAL STANDARD FOR DECIDING A RULE 12(c) MOTION

"A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)," with several important distinctions—distinctions ignored by Defendants in their Motion. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Doe v. Myspace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). "As with a Rule 12(b)(6) motion, the question under Rule 12(c) is whether the plaintiff is entitled to offer evidence to support his claim, not whether he will ultimately prevail on the merits." *Shaunfield v. Experian Info. Solutions, Inc.*, 991 F.Supp.2d 786, 793 (N.D. Tex. 2014).

The Court must "accept the ***complaint's*** well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson*, 385 F.3d at 529 (emphasis added). The defendant's (or movant's) pleadings, however, are entitled to no such presumption or deference.

> On defendant's motion for judgment on the pleadings, where no matters outside the pleadings [or attachments thereto] are presented, the fact allegations of the complaint are to be taken as true, ***but those of the answer [and counterclaims] are taken as true only where and to the extent that they have not been denied or do not conflict with those of the complaint***. In other words, a judgment on the pleadings alone, if sustained, must be based on the ***undisputed facts*** appearing in all the pleadings."

*Stanton v. Larsh*, 239 F.2d 104, 106 (5th Cir. 1956).[2]  Further, the Court must "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010). For affirmative defenses, a Rule 12(c) dismissal is appropriate only when such defense "appears clearly on the face of the pleadings," and factual allegations regarding any such defenses are presumed false if denied. *Abreu v. Zale Corp.*, No. 3:12-CV-2620-D, 2013 WL 1949845, at *1 (N.D. Tex. May 13, 2013).  Finally, "when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings is improper." *Guidry v. Am. Public Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007); *see also Greenberg v. General Mills Fun Group, Inc.*, 478 F.2d 254, 256 (5th Cir. 1973) (reversing judgment on the pleadings based on ambiguity in contract provision).  To that end, "[in a motion to dismiss context] all contractual ambiguities must be resolved in the plaintiff's favor." *Geske v. Wells Fargo Bank, Nat. Ass'n*, No. 3:11-CV-3337-L, 2012 WL 1231835, at *3 (N.D. Tex. Apr. 12, 2012).

## III.    ARGUMENT & AUTHORITIES

### A.    Qualcomm Defendants Fail to Satisfy Their Heavy Burden to Prove That the Parties to the CSR Agreement Intended to Benefit Qualcomm Defendants.

Under California law,[3] "[a] third party's right to enforce covenants of a contract is predicated on the contracting parties' intent to benefit the third party." *Vahle v. Barwick*, 113 Cal. Rptr. 2d 793, 796 (Ct. App. 2001).  A third party must demonstrate that the contracting

---

[2] *See also Whitehurst v. Liquid Environmental Solutions, Inc.*, 45 F. Supp.3d 1328, 1339 (M.D. Fla. 2014) ("For purposes of a motion for judgment on the pleadings, all the non-moving party's pleadings are taken as true, ***and if denied, the moving party's allegations are taken as false***." (emphasis added)).  Additionally, the Court must not consider attachments to a defendant's pleading unless they are "referred to in the Complaint and are central to [plaintiff's] claim," *Collins v. Morgan Stanley*, 224 F.3d 496, 498-99 (5th Cir. 2000).  *See also, e.g., Toliver v. City of New York*, 2012 WL 7782720, at * 4 (S.D.N.Y. Dec. 10, 2012) (declining to consider documents attached to answer).

[3] "The [CSR Agreement] shall be interpreted and governed in accordance with California law, without reference to conflict of laws principles."  (CSR Agmt. § 11.)

parties "*must*" have intended to benefit the unnamed party." *Whiteside v. Tenet Healthcare Corp.*, 124 Cal. Rptr. 2d 580,590 (Ct. App. 2002) (emphasis added). As the California Supreme Court explained, "[t]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement." *Hess v. Ford Motor Co.*, 41 P.3d 46, 51 (Cal. 2002); *accord Vahle*, 113 Cal. Rptr. 2d at 796 (citing *Neverkovec*, 87 Cal. Rptr. 2d at 865). This rule is particularly relevant to settlement agreements. The presumption that "a third party should *not* enjoy the same privilege to rely on the four corners of a release agreement as the parties themselves," rests on a common-sense notion: because a third party ordinarily "has taken no part in the satisfaction of a plaintiff s claim," it "should not gratuitously benefit from settlement arrangements undertaken at the time and expense of others." *Neverkovec* v. *Fredericks*, 87 Cal. Rptr. 2d 856, 869 n. 12 (Ct. App. 1999). "Interpreting a release by looking only to the four corners of the document," California courts have repeatedly explained, simply "poses too great a risk that a plaintiff will be trapped into surrendering a separate cause of action when this was not his or her intent." *Neverkovec*, 87 Cal. Rptr. 2d at 869 n. 12 (internal quotations and citations omitted).

In this case, Qualcomm Defendants fail to satisfy their heavy burden to show that the parties to the CSR Agreement intended to benefit Qualcomm Defendants. Indeed, their claim that they are entitled to benefit from the CSR Agreement's release, license, and covenant not to sue relies on nothing but a tortured interpretation of the Agreement itself, which is insufficient under California law. Further, as shown below, Qualcomm Defendants ignore the intent of the parties, as expressed throughout the CSR Agreement, to limit the scope of the release, license, and covenant not to sue solely to the conduct and products of Bandspeed and CSR. (See *infra* Parts III.B – F.) Accordingly, this Court should deny Qualcomm Defendants' Motion.

**B. The Term "CSR" Does Not Include Any Qualcomm Defendant.**

The linchpin to Qualcomm Defendants' motion is the claim that each Defendant qualifies as "CSR," as that term is defined by the CSR Agreement and used in the Agreement's license, covenant not to sue, and release. (Mot. at 8, 10, 16.) Section 1 of the CSR Agreement defines CSR as follows: "'CSR' means [note the present tense], collectively, Cambridge Silicon Radio Limited, CSR Technology Inc., and each of their respective parents, subsidiaries, and affiliates." (CSR Agmt. at § 1.) Qualcomm Defendants contend the term "CSR" changes over time as the parents, subsidiaries, and affiliates change over time. This contention violates the intent of the parties to the contract—Bandspeed and CSR—as well as clear and binding rules of contract interpretation under California law.

1. "CSR" Does Not Include Qualcomm Defendants Because California Law Requires the CSR Agreement to Be Interpreted According to the Parties' Intention as It Existed at the Time of Contracting.

Under California Civil Code section 1636: "A contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting*, so far as the same is ascertainable and lawful." West's Ann. Cal. Civ. Code § 1636 (emphasis added). Qualcomm Defendants argue that the term "CSR" must not be interpreted "as it existed at the time of contracting" but instead should be interpreted as of the date a Qualcomm entity allegedly acquired a CSR affiliate, August 13, 2015 (almost three years after "the time of contracting"). This argument directly contradicts Cal. Civ. Code § 1636 and should be rejected. Bandspeed and CSR executed the CSR Agreement on October 17 and 19, 2012, respectively. (CSR Agmt. at 9.) At that time of contracting, none of the Qualcomm Defendants was a parent, subsidiary, or affiliate of Cambridge Silicon Radio Limited or CSR Technology Inc. Neither Bandspeed nor CSR intended to bestow rights on Qualcomm Defendants or some future acquirer of CSR; otherwise, the CSR Agreement would have expressly used a term such as "successor" or

"affiliate of a successor" or "future affiliate" in the definition of "CSR." For this reason alone, Defendants' Motion must be denied.

   2. <u>"CSR" Does Not Include Qualcomm Defendants Because the Parties Explicitly Mentioned Future Entities in Other Contexts But Not in the Definition of "CSR."</u>

"'Whether a third party is an intended beneficiary . . . to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.'" *Neverkovec*, 74 Cal.App.4th at 349, 87 Cal.Rptr.2d 856. Under the California "rule of construction *expressio unius est exclusion alterius*," the mention of one matter implies the exclusion of all others. *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013) (applying California law). As stated above, the CSR Agreement defines "CSR" as "collectively, Cambridge Silicon Radio Limited, CSR Technology Inc., and each of their respective parents, subsidiaries, and affiliates." (CSR Agmt. at 1.) That definition includes a list of entities: "Cambridge Silicon Radio Limited, CSR Technology Inc., and each of their respective parents, subsidiaries, and affiliates." (*Id.*)

Throughout the CSR Agreement, the parties used numerous terms that were not included in the "CSR" definition list. These include the terms "successor" (*Id.* at § 2.C, 3, 4(A)1, 5), "assign" (*Id.* at § 2.C, 3, 4(A)1, 5), "any other person or entity who obtains ownership" *(Id.* at § 3), "acquiring party" (CSR Agmt. at § 4.A.(3)), "surviving party" (*Id.* at § 4.A.(3)), "acquirer" *(Id.),* "Transferred Entity." *(Id.)* Despite that ability and understanding, the parties to the CSR Agreement excluded terms such as "successor" or "affiliate of a successor" from the definition of "CSR." (*Id.* at § 1) As such, Qualcomm cannot now be permitted to read those terms into the definition of CSR after the parties excluded them. Indeed, "CSR" means "CSR" as that term was defined and existed on the Effective Date of the CSR Agreement, October 18, 2012.

In *Unova, Inc. v. Acer Inc.*, 363 F.3d 1278 (2004), the Federal Circuit, applying

California law, used similar intrinsic evidence to conclude that a similar settlement agreement did not extend to a successor affiliate:

> Moreover, Unova and Compaq elsewhere referred to future entities, such as "past, present, and future officers, directors, shareholders . . . ," when they so intended, and the fact that they did not similarly modify the term "parents" suggests that they did not seek to release Compaq's future parents. We thus conclude that the release provision does not encompass Compaq's future parents.

*Id.* at 1282.  Based on the intrinsic evidence in the respective settlement agreement, the Federal Circuit concluded that the settlement agreement in that case did not inure to the benefit of a successor to an original party to the settlement agreement:  "[T]he settlement agreement, read as a whole, makes clear that Unova and Compaq did not intend to release Hewlett-Packard from liability for infringement of Unova's smart battery patents."  *Id.* at 1283.  The Federal Circuit's reasoning in *Unova* applies equally to the CSR Agreement here.

3.  <u>"CSR" Does Not Include Qualcomm Defendants Because the Same Word Used in Different Parts of a Writing Must Have the Same Meaning.</u>

"[T]he same word used in an instrument is generally given the same meaning unless the [contract] indicates otherwise."  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 475, 84 P.3d 385, 393 (2004).  The term "CSR" is used throughout the CSR Agreement to exclude each Qualcomm Defendant from its meaning.  Section 2.B(5) of the CSR Agreement states:

> "Bandspeed's obligations under Section 2(B)(4) of this Agreement shall be fully satisfied when Bandspeed files the amended complaint stating that each cause of action asserted against the remaining defendants is based solely upon a defendant's conduct that has not been released by Bandspeed under the 'Binding Settlement and License Agreement' *entered into between Bandspeed and CSR*."

(CSR Agmt. at § 2.B(5) (emphasis added).)  The CSR Agreement was "entered into between Bandspeed and CSR," not between Bandspeed and any Qualcomm Defendant or an affiliate of a Qualcomm Defendant.  (*Id.*)  Changing "CSR" to mean different things within different parts of the CSR Agreement results in inconsistencies and errors.  For example, under Qualcomm's

proffered construction of the term "CSR," the Qualcomm Defendants and their affiliates granted

Bandspeed, and any party that acquires Bandspeed, covenants not to sue pursuant to 4.B(1) of

the CSR Agreement:

> CSR [read now: Qualcomm and its affiliates] covenants not to bring any claim against Bandspeed, asserting that Bandspeed's activities during the Covenant Period in making, having made, using, offering to sell, selling, importing, exporting, or otherwise disposing of Bandspeed products or services infringe any of the Covered Patents.

"Covered Patents" includes "all patents . . . owned (in whole or in part) or controlled (directly or

indirectly) by CSR [read now: Qualcomm and its affiliates] . . . as of, or at any time after, the

Effective Date."  (CSR Agmt. at § 1.)  In addition to violating the canon of contractual

interpretation requiring that the same word used in an instrument be given the same meaning,

Qualcomm's proffered construction leads to absurd results – i.e., Qualcomm's licensing of all of

its patents to Bandspeed *and any party that acquires Bandspeed*.

## C.    The Term "CSR Licensed Products" Does Not Include Any Qualcomm Product.

Qualcomm also argues that the term "CSR Licensed Products," as used in the license and

covenant not to sue provisions of the CSR Agreement, extends to products of the Qualcomm

Defendants.  (Mot. at 10, 16.) "CSR Licensed Products" is defined follows:

> "CSR Licensed Products" means any and all products … of CSR designed by or on behalf of CSR and made, sold, or, in the case of a software product, licensed, by CSR. For avoidance of doubt, the definition of "CSR Licensed Products" shall not apply to any products that CSR manufactures or has manufactured as a foundry or contract manufacturer for a third party based on designs provided by such third party in substantially completed form.

(CSR Agmt. at § 1.)  Because the term "CSR" does not include any Qualcomm Defendant, the

term "CSR Licensed Products" is limited to "products . . . of CSR designed by or on behalf of

CSR and made, sold, or in the case of a software product, licensed, by CSR" as "CSR" was

defined on October 18, 2012.  Qualcomm Defendants did not and cannot show that any Accused

Product was a "product[] . . . of CSR designed by or on behalf of CSR and made, sold, or in the

case of a software product, licensed, by CSR." As such, none of the Qualcomm Accused Products qualify as "CSR Licensed Products."

Again in *Unova,* the Federal Circuit used similar intrinsic evidence to conclude that a similar settlement agreement did not extend to a successor affiliate: "Those provisions expressly apply only to Compaq-branded products and so, even as Compaq's parent, Hewlett–Packard does not enjoy the benefits of the covenant-not-to-sue and license provisions for the manufacture and sale of non-Compaq-branded products." *Id.* at 1282. Given the contractual similarities and the fact that, as here, California law applied to the settlement agreement in *Unova*, this Court must reach the same conclusion.

**D.     Bandspeed Did Not Grant a Release to the Qualcomm Defendants.**

Qualcomm Defendants argue that Bandspeed granted a release to all of the Qualcomm Defendants and quote the CSR Agreement for support:

> CSR and Bandspeed, in each case on behalf of itself and its successors and assigns, irrevocably releases, acquits, and forever discharges **the other Party** and its successors and assigns of all past, present, and future claims that the manufacture, use or sale, offer to sell, importation, exportation, or any other disposition of any **products sold by or for the other Party** through the Covenant Period . . . infringed or infringes any Bandspeed Asserted Patents . . . .

(Mot. at 7 (quoting CSR Agmt. at § 2.C).) Defendants then devote a couple of pages to explain how they arrived at the conclusion that "the release granted by Bandspeed in Section 2.C **extends** to Qualcomm Incorporated as the parent and successor of Cambridge Silicon Radio Limited and Qualcomm Atheros, Inc., and Qualcomm Innovation Center Inc. as affiliates of Cambridge Silicon Radio Limited." *(Id.* at 9.) Defendants' analysis is flawed.

1.     The Terms "Party" and "CSR" as Used in the Release Do Not Include Qualcomm Defendants.

The scope of the release in Section 2.C. of the CSR Agreement is limited to (1) claims against a "Party"; (2) arising from "products sold by or for the other Party . . . ." (CSR Agmt.

§ 2.C.)  The term "Party" is defined by the CSR Agreement as "CSR" and "Bandspeed" and the '359 Defendants."  (CSR Agmt., Preamble.)  As explained above, the term "CSR" as used in the release does not include any Qualcomm Defendant.  As a result, the release does not extend (1) to Qualcomm Defendants; or (2) to products sold by Qualcomm Defendants.

2.  <u>Qualcomm Defendants Are Not Successors of CSR.</u>

Qualcomm claims that Qualcomm Incorporated alone is a "successor" to "CSR" under the release in the CSR Agreement (Mot. at 8 ("[T]he release granted in Section 2.C applies to Qualcomm Incorporated, as both parent and the successor to CSR plc and Cambridge Silicon Radio Limited . . . .").)[4]  This claim fails even if the disputed allegations are true.

First, Qualcomm's argument relies on the disputed allegation that "Qualcomm Incorporated's subsidiary, **Qualcomm Global Trading Pte. Limited ("QGT")**, acquired **CSR plc**–the parent company of Cambridge Silicon Radio Limited–making Qualcomm Incorporated the parent and an affiliate of Cambridge Silicon Radio Limited."  (Mot. at 4.)  But QGT is not a defendant in this lawsuit and there is no claim that the Qualcomm Defendants acquired CSR.

A "successor" "with reference to corporations, generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumed burdens of first corporation."  Blacks Law Dictionary, 6th Ed., at 1431.  Accordingly, there is no showing that QGT's mere acquisition of CSR plc qualifies any of the Qualcomm Defendants as a successor to CSR under the CSR Agreement's release.  Indeed, logic dictates that a corporate entity can have only one successor and to the extent that QGT is that successor, then each and every Qualcomm Defendant is not and therefore cannot benefit from the release as a successor.  With regard to CSR assigns, Defendants did not and cannot make a

---

[4] Qualcomm Defendants do not claim Qualcomm Atheros, Inc. or Qualcomm Innovation Center, Inc. is a successor to CSR under the CSR Agreement.

showing that any Qualcomm Defendant qualifies as an assignee. As such, none of the Qualcomm Defendants qualifies as a named beneficiary to the release (i.e., CSR, CSR Successor, CSR Assign).

Second, even if Qualcomm Defendants' claim to be "successors" under the release were correct (which it is not), it cannot permit Qualcomm Defendants to succeed to a release of claims asserted against Qualcomm Defendants in this litigation because only claims against CSR were released in the CSR Agreement.

Third, as stated above, the release applies only to "products sold by or for the other Party." (CSR Agmt. at § 2.C.) The operative "Party," as defined in the preamble to the CSR Agreement, is CSR. Defendants, however, have failed to show that the Qualcomm Accused Products qualify as "products sold by or for [CSR]." As such, Defendants' argument fails.

Qualcomm Defendants attempt to rely on *Advanced Micro Devices, Inc. v. Altera Corp*., 1996 WL 119482 (N.D. Cal. Mar. 11, 1996) fails for two reasons: (1) unlike the plaintiff in *Advanced Micro Devices*, none of the Qualcomm Defendants is a "successor" to the CSR Agreement and (2) the "extension" language on which the *Advanced Micro Devices* court relied as is absent from the CSR Agreement. First, in *Advanced Micro Devices*, the plaintiff AMD was the successor of MMI. *Id.* at *3. By Qualcomm's own admission, none of the Qualcomm Defendants is a successor: "Qualcomm Incorporated's subsidiary, **Qualcomm Global Trading Pte. Limited ("QGT")**, acquired **CSR plc**—the parent company of Cambridge Silicon Radio Limited—making Qualcomm Incorporated the parent and an affiliate of Cambridge Silicon Radio Limited." (Mot. at 4.) Second, the *Advanced Micro Devices* court's analysis relied on "extension" language in the agreement:

The Agreement, therefore, differentiates such a succession from the first two assignment exceptions. In the case of entities succeeding to the entire business and good will of a

party, the Agreement clearly allows not just a ***mere passage*** of a party's rights and licenses under the agreement to the successor but an ***extension*** of the licenses and rights granted under the Agreement to the successor. Consequently, under the plain language of the Agreement, AMD is licensed under the five Altera patents at issue.

(*Id.* at 3 (emphasis added).) That court held that the license extended to the successor AMD because of the use of the term "extension." In the instant case, however, the release, license and covenant ***do not*** contain the critical "extension" or similar language. The parties to the CSR agreement demonstrated an ability to use the term "extend" four times (CSR Agmt. at §§ 3, 4(A)1, 4(B)1, and 5.) However, the parties did not use the term "extend" in the release, license or covenant not to sue – the three clauses that are the subject of Defendants' Motion.

**E.    The Accused Products Are Not Licensed.**

Without analysis of the license itself or citation to authority, Qualcomm Defendants argue "the license granted under the Agreement *extends* to Defendants as the parent and affiliates of licensee Cambridge Silicon Radio Limited." (Mot. at 10.) This argument fails.

1.    The Term "CSR" as Used in the License Does Not Include Qualcomm Defendants.

Section 3 of the CSR Agreement provides the following license:

Subject to the timely receipt of payment under Section 8 below, Bandspeed grants to CSR and to any customer of CSR License Products (the "Bandspeed License Grant") a non-exclusive, non-transferable (except as otherwise set forth herein), perpetual, irrevocable, fully paid-up, worldwide license, without the right to sublicense, under the Bandspeed Asserted Patents, to make, have made, use, sell, offer for sale, import, export and otherwise dispose of CSR Licensed Products, and to practice and perform any and all methods and processes in the manufacture, use, sale, offer for sale, import, export or other disposition of CSR Licensed Products.

For the avoidance of doubt, the Bandspeed License Grant shall extend to all CSR's customers anywhere in the stream of commerce, including any third parties who purchase any CSR Licensed Products and to entities in CSR's supply and distribution chains, but only with respect to CSR Licensed Products.

(CSR Agmt. at § 3.) According to the plain meaning of the CSR Agreement, the license is granted to CSR and customers of CSR Licensed Products only. Again, as discussed above, the term "CSR" did not, does not, and cannot include any Qualcomm Defendant. (See *supra* Part

III.B.)  The license does not list "successors," "assigns," "future affiliates," "affiliates of successors" or any other term which would qualify a Qualcomm Defendant as a beneficiary of the license.  Therefore, Bandspeed simply did not grant the license to any Qualcomm Defendant.

Realizing that the Federal Circuit's opinion in *Unova, Inc. v. Acer, Inc.*, 363 F.3d 1278 (Fed. Cir. 2004), is fatal to their Motion, Qualcomm Defendants devote a significant portion of their brief to an attempt to distinguish it.  This attempt fails.  In *Unova*, the Federal Circuit held that a release of infringement claims granted by Unova to Compaq and its "parents" did not extend to Hewlett-Packard, which acquired Compaq after the execution of the release. Qualcomm Defendants claim that *Unova* should not apply to the interpretation of the license in the CSR Agreement because the "license . . . –unlike the release in the *Unova* Agreement–is not . . . limited to past acts of infringement."  (Mot. at 12.)  This claim, however, ignores the key elements of the Federal Circuit's ruling, all of which apply to this case.

First, the Court held that the agreement did not "encompass Compaq's future parents" because "Unova and Compaq elsewhere referred to future entities," but "did not similarly modify the term 'parents'" when referring to Compaq.  *Id.* at 1282.  Although CSR and Bandspeed referred to future entities elsewhere in the Agreement, the parties consciously chose to omit future entities from the definition of "CSR" as used in the license, release, and covenant not to sue.  (See *supra* Part III.B.2.)

Second, the Court relied on the parties' agreement in *Unova* to limit the license and covenant not to sue to Compaq products "so, even as Compaq's parent, Hewlett-Packard does not enjoy the benefits of the covenant-not-to-sue and license provisions for the manufacture and sale of non-Compaq branded products."  *Id.* at 1282.  Likewise, the covenant not to sue and license in the CSR Agreement are limited to "CSR Licensed Products," i.e., "products . . . of

CSR designed by or on behalf of CSR and made, sold, or in the case of a software product, licensed, by CSR" as "CSR" was defined on October 18, 2012.  (See *supra* Part III.C.)

Third, noting that the Agreement in *Unova* was executed on May 4, 2001, the Court emphasized that the settlement agreement's release provisions were "written in the present tense," "mean[ing] simply that, *as of May 4, 2001*, Unova released Compaq, its parents and its subsidiaries from liability . . . ."  *Id.* (emphasis added).  The Court found that "Hewlett-Packard was not Compaq's parent on that date and, as a consequence, is not entitled to the benefit of the release."   As in *Unova*, the license, release, and covenant not to sue in the CSR Agreement are written in present tense.  (CSR Agmt. at §§ 2.C ("releases"), 3 ("grants"), 4 ("covenants").) Qualcomm Defendants are not entitled to the benefit of these provisions because they, by their own admission, were not CSR's "parents, subsidiaries, or affiliates" when the CSR Agreement was executed.

2. The Term "CSR Licensed Products" as Used in the License Does Not Include the Accused Products of Qualcomm Defendants.

Even if the license was granted to the Qualcomm Defendants (which it was not), the license is limited to CSR Licensed Products:  "Bandspeed grants to CSR . . . license . . . under the Bandspeed Asserted Patents to make . . . CSR Licensed Products, and to practice . . . all methods and processes in the manufacture . . . of CSR Licensed Products."  *(Id.* at § 3.) Defendants fail to establish that any of the Accused Products qualify as CSR Licensed Products. (See *supra* Part III.C.)  As such, Defendants' license argument fails.

3. The License Was Not Transferred or Assigned to Defendants Through a Change of Control.

   a) *The License Is Expressly Non-Transferable and Cannot be Sublicensed.*

Defendants also argue that the license under the CSR Agreement was transferred or assigned to them through a "change of control."  (Mot. at 13 - 15.)  But Defendants ignore that

the CSR Agreement expressly states that the license is non-transferable and cannot be sublicensed: "Bandspeed grants . . . a . . . non-transferable (except as otherwise set forth herein) ... license, without the right to sublicense." (CSR Agmt. at § 3.) Nonetheless, Defendants argue that section 10 of the CSR Agreement somehow changes that plain language—it does not.

        b)        *A Section 10 Change of Control Does Not Make the License Transferable or Assignable.*

Defendants twist the CSR Agreement to ultimately conclude: "Thus, when a 'Change of Control' occurs in which 'CSR' is the Acquired Party . . . the license . . . is enforceable by the Defendants because it is automatically transferred/assigned to the acquiring party and the products of the acquiring party are licensed regardless of whether they were commercially available prior to the date of the 'Change of Control.'" (Mot. at 15.) Defendants' analysis and conclusions are wrong.

After noting that the license states that it is "non-transferable (except as otherwise set forth herein)," Defendants then selectively quote *parts* of Section 10 of the CSR Agreement, leaving out language that squarely undermines their argument. Section 10 provides (bolded text indicates language omitted by Qualcomm):

> This Agreement is non assignable/non-transferable by any Party except (a) in connection with an internal reorganization or restructuring . . . , or (b) in connection with a Change of Control of **such** [Qualcomm substituted "a" for "such" in the block quote it provided in each motion] Party, in which case no consent shall be required whatsoever in connection with such Change of Control**, and the <u>changes</u> to the rights and obligations hereunder shall occur automatically <u>as provided herein, specifically as set forth in Section 3 or 4,</u> as applicable to** such Change of Control.

(CSR Agreement §10.) Defendants quote the portion of Section 10, the sum total of which means CSR did not need Bandspeed's consent to change control—but that's not the issue. The issue is whether a "change of control" causes "***changes*** to the rights and obligations [under the CSR Agreement]." Nothing in Section 10 allows a transfer or assignment of rights; Section 10

expressly states "the rights and obligations" only "***change***" (not "transfer") "as provided herein, specifically as set forth in Section 3 or 4." (*Id.* at § 10.) In other words, the parties (as well as this Court) are required to look to Sections 3 and 4 to determine whether a "change of control" causes "***changes*** to the rights and obligations." Contrary to Defendants' claim, (Mot. at 15), Sections 3 and 4 do not cause the automatic transfer or assignment of the license.

> c) *Section 3 Expressly Forbids Transfer of the Bandspeed License and the Only Language in Section 3 Related to a Change of Control Is Not Applicable Because It Applies Solely to a Bandspeed Change of Control.*

The license found in Section 3 expressly states that the license is non-transferable and cannot be sublicensed: "Bandspeed grants . . . a . . . non-transferable (except as otherwise set forth herein) . . . license, without the right to sublicense." (CSR Agmt. at § 3.)[5] The third paragraph of Section 3 does provide a "change" to the license where there has been a change of control, but that anticipated "change of control" is not what occurred in the instant case. The third paragraph of Section 3 provides:

> Any rights granted under Section 3 shall run with the title of the Bandspeed Asserted Patents and shall be binding on Bandspeed's successors and assigns and any other person or entity who obtains ownership in, or the right to enforce, the Bandspeed Asserted Patents.

(*Id.*) Nothing in Section 3 addresses a change in control of CSR. As a result, the provisions of Sections 3 and 10 prohibiting the transfer, assignment, or sublicense of Bandspeed's license control.

**F.    Bandspeed Did Not Covenant Not to Sue Defendants**

1.   The Term "CSR" as Used in the Covenant Not to Sue Does Not Include Qualcomm Defendants.

Section 4 provides a "ten-year covenant not to sue": "Bandspeed . . . covenants not to bring any claim against ***CSR***, asserting that ***CSR's activities*** during the Covenant Period in

---

[5] Section 4 addresses the CSR Agreement's covenant not to sue. (CSR Agmt. at § 4.)

making, having made, using, offering to sell, selling, importing, exporting, or otherwise disposing of **CSR Licensed Products**, infringing any of the Covered Patents." (CSR Agmt. at § 4(A)1.) Defendants contend that Bandspeed's claims are barred because it covenanted not to sue Qualcomm Defendants in the CSR Agreement. Defendants again rely on their flawed interpretation of the term "CSR," arguing that rights provided to CSR in the CSR Agreement extend to the Qualcomm Defendants. As explained above, the term "CSR" did not, does not, and cannot extend to any Qualcomm Defendant. (See *supra* Part III.B.)

*GTE Wireless, Inc. v. Cellexis International, Inc.*, 341 F.3d 1 (1st Cir. 2003) does not support Defendants' position. **First**, the *Cellexis* court concluded that "[t]here are conflicting reasonable interpretations of the contract language. These conflicting interpretations create a triable issue of fact that requires the fact-finder to determine whether the parties intended to include future affiliates within the definition of GTE." *Id.* at *7. In other words, a case with contractual ambiguities requiring evidence of the parties' intent cannot justify dismissal. *See Guidry*, 512 F.3d at 181; *Greenberg*, 478 F.2d at 256. **Second**, the *Cellexis* court considered extrinsic evidence to conclude:

> [I]t is beyond doubt that GTE desired a broadly worded agreement. GTE wished to be released from substantial potential liability. * * * The imprecise contract language defining GTE in Paragraph 1.3 is reasonably susceptible to GTE's interpretation that the parties intended the Settlement Agreement to cover future affiliates.

*Id.* at *7. That is, the court considered extrinsic evidence to determine the intent of a party to the agreement at the time of contracting—GTE was a party to the agreement. Here, neither Defendants nor their affiliates were a party to the contract. In *Cellexis*, the court had extrinsic evidence supporting the proposition that GTE intended the agreement to benefit the entire GTE corporate family, past and future. Here, no evidence supports the proposition that CSR intended to benefit a different (and at the time, rival) corporation, Qualcomm. **Third**, *Cellexis* was not

decided under California law.[6] Instead, the Court of Appeals applied Arizona Law, which allowed the introduction of extrinsic evidence to conclude there was a triable issue – a process not allowed under the applicable California Law. As the Federal Circuit explained in *Unova*:

> Having considered all of the intrinsic evidence, we turn next to the parties' dispute over the extent to which we may rely on extrinsic evidence in interpreting the scope of the release provision. We conclude that it is unnecessary for us to consider (or to remand for consideration of) the extrinsic evidence cited by the parties, given that the settlement agreement, read as a whole, makes clear that Unova and Compaq did not intend to release Hewlett–Packard from liability for infringement of Unova's smart battery patents. *See* Cal. Civ. Code § 1639 (Deering 2004) ("[T]he intention of the parties is to be ascertained from the writing alone, if possible ...."); *see also* Cal. Civ. Proc. Code § 1856 (Deering 2004) (California's parol evidence rule). In any event, Hewlett–Packard may not rely on extrinsic evidence to show that Unova and Compaq intended to release it from liability for infringement in the absence of any expression of such intent in the settlement agreement itself. *See Brinton,* 90 Cal.Rptr.2d at 474 (stating that the contracting parties' intent to benefit a third party must appear in the terms of the agreement). We therefore decline to consider the extrinsic evidence cited by the parties.

*Unova*, 363 F.3d at 1284. Without the use of extrinsic evidence, the *Cellexis* court would not have been able to conclude that the term "GTE" (as defined in the settlement agreement at issue in Cellexis case) ***might*** include an affiliate of GTE that was not an affiliate of GTE at the time the Settlement Agreement was executed.[7]

2.  The Term "CSR Licensed Products" as Used in the License Does Not Include the Accused Products of Qualcomm Defendants.

Even if the covenant not to sue was granted to the Qualcomm Defendants (which it was not), it is limited to CSR Licensed Products, which does not include the Accused Products of Qualcomm Defendants. (*See* supra Part III.C.)

3.  Cambridge Silicon Radio Limited's Rights Under the Covenant Were Not Transferred or Assigned to Qualcomm Defendants through a Change of Control.

Defendants again argue that "the covenant granted under Section 4 of the Agreement

---

[6] Arizona Law does not have the benefit of numerous rules of California Law that undermine Qualcomm's position, including California Civil Code 1636. (See *supra* Part III.B.1.)

[7] Further, as explained in subsection III.F below, consideration of such extrinsic evidence would take the issue outside the proper bounds of Rule 12(c).

automatically also now extends to Qualcomm . . . ." (Mot. at 19.) This argument fails. As stated above, Section 10 expressly states "the rights and obligations" under the CSR Agreement only "***change***" (not "transfer") upon a change in control "as provided herein, specifically as set forth in Section 3 or 4." (*Id.* at § 10.) Thus, Sections 3 and 4 determine whether a "change of control" causes "***changes*** to the rights and obligations." Section 4 of the CSR Agreement, which addresses the covenant not to sue, includes language regarding the "effect of change of control" as it relates to CSR: "In the event of a Change of Control where CSR is the Acquired Party, the rights, licenses, and covenants granted by Bandspeed ***in this Section 4*** shall survive and shall be ***enforceable by the acquiring or surviving party***." (CSR Agmt. at § 4(A)3.) In other words, QGT (which is not a defendant in this lawsuit) can "enforce" the covenant that "Bandspeed . . . not . . . bring any claim against ***CSR***, asserting that ***CSR's activities*** during the Covenant Period in making, having made, using, offering to sell, selling, importing, exporting, or otherwise disposing of ***CSR Licensed Products***, infringing any of the Covered Patents." (*See id.*) QGT's ability to "enforce" this covenant in relation to the instant lawsuit is problematic as previously described: (1) QGT is not a Defendant in this lawsuit; (2) the term "CSR" did not, does not, and cannot include any Qualcomm Defendant; and (3) the term "CSR Licensed Products" does not include any Accused Product.[8]

## G. Disputed Issues of Fact Regarding the CSR Agreement Require the Denial of Defendants' 12(c) Motion.

All of Qualcomm Defendants' arguments in support of the motion rely on factual allegations in Qualcomm Defendants' pleadings regarding the existence, nature, and effect of

---

[8] Moreover, Section 10 of the CSR Agreement expressly prevents QGT from transferring or assigning its ability to enforce the covenant not to sue to any or all of the Qualcomm Defendants: "This Agreement is non assignable/non-transferable by any Party except. . . ." (CSR Agmt. at § 10.) Although Section 4(A)3 allows the "acquiring or surviving party" to enforce the covenant not to sue, there is no further right given to QGT to transfer or assign that right of enforcement. In all events, QGT's "enforcement" right is limited to enforcement of the covenant not to sue "CSR" (not any Qualcomm Defendant) with regard to CSR Licensed Products (not Accused Products).

QGT's alleged acquisition of CSR plc. (*See* Docs. 93 – 95 at ¶¶ 83 – 85, 118 – 151.)  Bandspeed has not had any discovery regarding these allegations and, therefore, in its Answers to Defendants' Amended Counterclaims, denied the respective allegations.  (*See* Docs. 97 – 99 at ¶¶ 118 – 151.)  Such allegations are inconsistent with—and disputed by—Bandspeed's First Amended Complaint as a whole.  (*See* Doc. 54.)  Pursuant to long-standing Fifth Circuit law, Qualcomm's allegations regarding these defenses cannot be the basis of a 12(c) motion, cannot be taken as true and, in fact, must be taken as false.  *See Stanton*, 239 F.2d at 106; *see also Whitehurst*, 45 F.Supp.3d at 1339.  Therefore, the Court must deny Defendants' 12(c) Motion.[9]

Further, Qualcomm Defendants are not entitled to any benefit under the unambiguous terms of the CSR Agreement.  However, if the Court concludes that an ambiguity exists in the CSR Agreement (it does not), then the Court is obligated to resolve that ambiguity in Bandspeed's favor and deny Qualcomm's motion.  *See Guidry*, 512 F.3d at 181.  Given the possibility of ambiguities and existence of disputed issues of fact, Defendants' release, license and covenant affirmative defenses and counterclaims do not "appear clearly from the face of the pleadings," thus requiring denial of the Motion.  *See Abreu*, 2013 WL 1949845, at *1.

## PRAYER FOR RELIEF

Plaintiff Bandspeed, Inc., respectfully prays that Defendants' Motion for Judgment on the Pleadings be denied with prejudice.  Plaintiff prays for such other and further relief to which it may be justly entitled.

---

[9] In addition to Bandspeed's denial of Defendants' allegations, such allegations are conclusory and/or nothing more than legal conclusions.  (*See, e.g.* Docs. 93 – 95 at ¶¶ 122, 123 and 125 (making the legal conclusion that "Qualcomm Incorporated "is the parent of Cambridge Silicon Radio," and that Qualcomm Atheros and Qualcomm Innovation Center, Inc. are "affiliates" of Cambridge Silicon Radio Limited.").  For this additional reason, Defendants' affirmative defenses/counterclaims of release, license, and covenant cannot form the basis of a Rule 12(c) dismissal.

Dated: April 27, 2016                      Respectfully submitted,

By:     /s/ Christopher V. Goodpastor
        Christopher V. Goodpastor
        State Bar No. 00791991
        Andrew G.  DiNovo
        State Bar No. 00790594
        Adam G. Price
        State Bar No. 24027750
        Stefanie T. Scott
        State Bar No. 24061617
        Gregory S. Donahue
        State Bar No. 24012539
        DINOVO PRICE ELLWANGER & HARDY, LLP
        7000 N.  MoPac Expressway, Suite 350
        Austin, Texas 78731
        Telephone:  (512) 539-2626
        Facsimile:  (512) 539-2627
        Email: cgoodpastor@dpelaw.com
               adinovo@dpelaw.com
               aprice@dpelaw.com
               sscott@dpelaw.com
               gdonahue@dpelaw.com

        Francisco Guerra, IV
        State Bar No. 00796684
        Mikal C. Watts
        State Bar No. 20981820
        Mark A. J. Fassold
        State Bar No. 24012609
        Jorge L. Mares
        State Bar No. 24087973
        WATTS GUERRA LLP
        4 Dominion Drive
        Bldg. 3, Ste 100
        San Antonio, Texas 78257
        Telephone:  (210) 447-0500
        Facsimile:  (210) 447-0501
        Email:  fguerra@wattsguerra.com
               mcwatts@wattsguerra.com
               mfassold@wattsguerra.com
               jmares@wattsguerra.com

        **ATTORNEYS FOR PLAINTIFF**
        **BANDSPEED, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Christopher V. Goodpastor
Christopher V. Goodpastor